[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case comes to this court on a return date of January 28, 1992 wherein the plaintiff Lorna Freeman (hereinafter called the wife) brought an action for legal separation. Thereafter, the husband answered the complaint and on September 10, 1992 filed a cross-complaint seeking a dissolution of the marriage pursuant to General Statutes 46b-40. For the reasons set forth hereinafter, this court dissolves this marriage on the cross-complaint.
The wife whose maiden name was Lorna Stearns married Lawrence Freeman at Billings, Montana on January 4, 1969. The wife has resided continuously in Connecticut for at least a year prior to the date of the filing of the complaint. The parties have two minor children of the marriage to wit, Eleanor Clair born August CT Page 1094 18, 1975 and Catherine born April 19, 1979. Neither of the parties have been or are receiving aid from the State of Connecticut.
The husband is age 45 and the wife is age 44. The parties have been married for over 23 years. There are two minor children of the marriage ages seventeen and thirteen.
The husband is presently employed by Forbes, Incorporated and earns an annual gross base salary of $130,000.00. In 1991 he did receive a bonus of $2,500 which was a purely discretionary bonus. The husband had previously been employed by the New York Times and has a pension and a supplemental retirement plan from that organization. In 1991 he received a net bonus and severance package in the approximate amount of $27,000 from the New York Times. He has worked successfully over the years in the publishing business. He has worked for Golf Digest and Family Circle Magazine among others. The husband is a college graduate.
The wife is also a college graduate. The wife worked briefly at the beginning of the marriage. She worked from March of 1971 through April 1972 at Saks Fifth Avenue in New York selling bathing suits. In 1972, she suffered a stroke which impaired her vision and she suffered temporary blindness and paralysis. She has substantially recovered from that stroke, but she has not worked since that time. She still complains of impaired vision and blind spots. She is a smoker who would like to stop but cannot. She talks about becoming disoriented on stress. She further indicates that she attempted a computer course recently that she did not successfully complete. This court is not able to ascertain with any certainty when if ever this woman will be able to participate in her own support. The husband is optimistic that she will be earning substantial money within a year. If that happens, it certainly can be addressed under our law based on a material and substantial change of circumstances.
Problems arose during the course of the marriage. The wife described the husband as not being there. The husband described the fact that he believed there were problems in the marriage in 1979 when they moved to California. He found throughout the marriage that there was no communication, no intimacy either physical or emotional. He felt the children were keeping the parties together. The parties went into counseling which did not work. Although it is clear that the husband is involved with another woman named LouAnn, the evidence establishes that he became physically involved with her in September of 1988. It appears to CT Page 1095 this court that part of the cause of the break down of the marriage was his involvement with the other woman. Both parties have substantially indicated that they felt they were at least in some part, part of the cause of the breakdown of the marriage.
In 1991, Exhibit 2 shows that the husband had gross earnings from employment of $168,562.00. Exhibit 5 shows the printout of the New York Times Company supplemental retirement and investment plan the total amount vested as of June 30, 1992 as $111,589.52 with the wife the designated beneficiary.
At the time of the marriage the husband had approximately $55,000 worth of stock. This stock was sold in part for the down payment on the purchase of the parties first home. He was further the recipient of stock from his family owned business from his father. This stock became CBS stock worth approximately $200,000. This stock was subsequently sold with half of the proceeds going into the home the parties purchased when they were in California and the other half used for remodeling of the Westport house.
Fortunately for the parties, their style of living throughout the marriage has been modest. They have attended very well to their children's needs.
Both of the girls live with the wife in the marital home. The children appear to have substantial musical ability and participate in a great many programs to enhance their musical talents. Clair is a senior at Staples High School in Westport. She has been the News editor of Inkling's, and she is a member of the Orphenians the premier musical singing group at the school. She has been the principal cellist in the orchestra and the chamber group. She has worked in the orchestra pit for the musicals done at the school. She has participated in programs at the Manhattan School of Music.
Catherine plays the piano and the trumpet. She is a violinist and she is the concert mistress at Bedford Middle School. She goes to high school next year. She has won musical distinctions throughout her musical career.
The parties live in a nice section of Westport near the Saugatuck River on River Lane. The house was purchased for $187,000 with a $100,000 mortgage and $87,000 in cash. Substantial improvements were done to the house in the magnitude of in excess of $75,000 approximately. The wife indicates that the house is in need of substantial repairs. When questioned, it became clear that CT Page 1096 these repairs were more than just repairs. Repair to the driveway is basically a relocation of the existing driveway. She estimated $6,000 to $12,000 to do the driveway. She talked about gutting the kitchen and had no idea of what the cost would be.
The husband has been involved with LouAnn since September of 1988. He is presently living with her. The rent for the apartment which they share is $1,400. LouAnn's share is $560 and he pays $840 or a 60%-40% split of the rent. LouAnn earns approximately $50,000 per year.
This court has listened to the witnesses in the case and reviewed all the exhibits. In addition, the court has taken into consideration all the statutory criteria set forth in 46b-81, the assignment of property and transfer of title statute, 46b-82 the alimony statute, and 46b-62 the attorney's fees statute. In addition, the court has considered 46b-84 the child support statute and the child support guidelines and the criteria and deviation criteria set forth therein. In addition, the court has considered all the evidence introduced in the case and has reviewed the parties financial affidavits, listened to the arguments of counsel and reviewed the extensive claims for relief, in addition to the calculations concerning child support guidelines and the tax consequences of the orders along with the affidavit re: counsel fees. The court makes the following orders;
1. The court dissolves the marriage on the grounds of irretrievable breakdown.
2. The parties stipulated on the record as to custody and visitation, all of which appears in this court's orders of December 2, 1992 as on the record, granting joint custody to the parties of the minor children with their principal residence with the wife.
3. The husband shall pay alimony to the wife in the sum of $50,000 per year. Payable $4,166 per month on the first of each month in advance.
4. Alimony shall be payable until the death of either party, the wife's remarriage or her cohabitation under the statute.
5. Any bonus the husband receives in 1993 for services performed in 1992 shall be divided 35% of the gross bonus to the wife and 65% to the husband on receipt of that bonus. He shall verify the amount received by providing any documentation received CT Page 1097 from the company evidencing the bonus including, but not limited to enclosure letters, tax forms and copies of the check. This is periodic alimony to the wife.
6. The husband shall maintain the Mass. Mutual Life Insurance policies as shown on the attached schedule dated December 2, 1992 being two policies that he owns and is the insured on for the benefit of the wife totalling $130,000. In addition, he shall provide the wife with one-half of his company provided insurance, if any, for her benefit as the irrevocable beneficiary of said policies for as long as he is obligated to pay alimony. He shall annually in the first month of the year, provide the wife with verification that said insurance is current and unencumbered beyond the current amounts of encumbrance of $8,076 as shown on the December 2nd Mass. Mutual Life Insurance accounting attached hereto. Failure to carry the aforementioned insurance shall allow the plaintiff to have a claim against the husband's estate.
7. The husband shall pay to the wife as and for child support, the sum of $5,000 per year child support for the two children in total. Said child support to be payable monthly in advance on the first day of each month in the sum of $416.66. Child support shall terminate as each minor child attains the age of eighteen years or becomes sooner emancipated. The court has reviewed the child support guideline computation and finds that the amount of $540 per week is the proper computation. (See support guidelines computation dated December 1, 1992 attached). The court has chosen to deviate from the child support guidelines based on this court's division of property, assets and debts, the alimony payments and the best interests of the children.
8. The wife and the minor children shall be entitled to exclusive possession of the premises at 26 River Lane until the house is sold. The parties are presently joint owners of that property.
9. Said premises shall be sold at such time as the youngest minor child finishes her first year of college. In the event she does not go to college or any other secondary school after high school, it shall be sold six months after the child graduates from high school.
10. Upon the sale of said property, the net proceeds shall divided 60% to the wife and 40% to the husband. CT Page 1098
11. Net proceeds are defined as the proceeds received after the property has been sold, and the mortgage paid off, brokerage commission paid, the conveyance taxes paid and other costs of the sale including reasonable attorney's fees for the sale have been paid.
12. The parties shall divide the cost of major repairs 60% to the wife and 40% to the husband. Major repairs are defined as any repair or replacement costing in excess of $300 per repair. The parties shall consult with each other and attempt to agree on the major repair. Consultation shall not be needed in the case of an emergency. The parties shall not unreasonably withhold their consent to a major repair. The court does not consider the driveway and the kitchen as aforesaid a repair.
13. This court shall retain jurisdiction to resolve any dispute with respect to the listing, selling, repairs or any other factor concerning the premises.
14. The husband shall maintain medical and dental insurance coverage for the minor children. The parties shall share equally the cost of all unreimbursed medical and dental expenses incurred by the minor children. The wife shall consult with the husband prior to incurring medical and dental expenses, except for routine care and in the case of an emergency. The provisions relating to medical insurance will be subject to the provisions of 46b-84c of the Connecticut General Statutes. The husband shall cooperate to assure the plaintiff's access to medical and dental coverage through his employment as provided under the COBRA provisions.
15. The parties jointly own 2,321 shares of the New York Times Stock. The parties have set forth their agreement concerning that stock which is set forth in the transcript of December 2, 1992 attached hereto. Both of the parties have signed off on that agreement and accordingly, it is made an order of the court.
16. The New York Times stock options shall be liquidated and after the payment of all taxes pertaining thereto, the net proceeds shall be divided equally between the parties.
17. The husband has two retirement funds available to him as the result of his previous employment with the New York Times.
The first one is the New York Times Supplemental Retirement Fund. It is a 401K Plan with a value of approximately $112,000.00. CT Page 1099 Said amount to be divided equally between the parties. The husband will transfer or assign his one-half interest in said plan to the wife and she will roll-over her one-half interest of said fund to a 401K or IRA of her choosing. The husband shall continue to name the wife as the beneficiary of his interest in said plan. The wife will draft the appropriate QDRO with the cooperation of the husband and the cooperation of the New York Times Pension Plan Administrator. The husband shall take any steps necessary to secure the post tax accessible portion of said plan so that each party will receive one-half share of that portion of the plan immediately.
18. The wife shall be entitled to a one-half interest in the New York Times Pension Plan pursuant to a Qualified Domestic Relations Order (QDRO). The QDRO shall provide that the plaintiff shall be paid 50% of any retirement benefits payable to the husband. The QDRO shall provide that the plaintiff will be maintained as the beneficiary of any joint or survivor annuity. The intent of this QDRO will be to ensure that the plaintiff continues to receive full pension payments not reducible in the event that the defendant predeceases the plaintiff. The defendant shall cooperate with the plaintiff in providing immediately written authorization to the New York Times Pension Department in order to enable the plaintiff to draft said QDRO. Until such time as the QDRO has been approved by the New York Times Pension Plan Administrator and the court, the court shall continue to maintain jurisdiction over the division of this asset. Further, the husband shall refrain from taking any action including, but not limited to, making loans or withdrawals which would diminish the value of this pension plan. The defendant shall immediately notify the New York Times Pension Administrator of this order. This order speaks as of the date it is rendered.
19. The wife has indicated by her affidavit of attorney's fees that she has incurred attorney's-fees in the approximate sum of $7,710.00. The court orders the husband to make a contribution towards those fees in the sum of $4,000.00 in order not to undermine the other financial orders of this court.
20. The husband shall transfer any and all present interest which he has in the Paterson Club Certificate to the wife in order to allow her to continue club membership. From and after the date of the transfer she shall be responsible for any and all charges incurred as a result of the use of said membership. This transfer shall be for one year from this date. At that time the membership CT Page 1100 shall be cancelled and the bond redeemed and the proceeds divided equally by the parties. In the event at the end of the year the wife chooses to continue the membership, she may pay out the husband's share of the bond to him in lieu of cancelling the membership.
21. The parties have divided their personal property between them. The wife shall be entitled to the personal property located in the family home with the exception of those items listed on Schedule A attached hereto which the husband may pick up as is mutually arranged between the parties within 30 days of the date of this decree.
22. The wife shall be solely responsible for the Citibank Visa bill of approximately $6,500 and the Union Trust Visa of approximately $5,000. The parties shall share equally in the non insurance unreimbursed amount due to Dr. Garrelick.
23. All of the claims for relief made by the parties not expressly addressed herein have been rejected by the court.
KARAZIN, J.
MASS-MUTUAL LIFE INSURANCE ACCOUNTING
INSURED OWNER POLICY NO. AMOUNT CASH VALUE — ----- ----- ---------- ------ ---------- Plaintiff Plaintiff 006692358 $ 15,000.00 $ 1,602.00 Defendant Plaintiff 006017440 $ 21,000.00 $ 3,330.00 Defendant Plaintiff 007416225 $ 33,000.00 $ 855.00 Defendant Defendant 005311379 $ 30,000.00 $ 8,076.00 Defendant Defendant 006304692 $100,000.00 $
THE PLAINTIFF
 BY ________________________________ Jean S. Ferlazzo Commissioner of the Superior Court Andersen Ferlazzo, P.C. 72 North Street, Suite 301 Danbury, CT 06810 744-2260 Juris No. 65280
This is to certify that a copy of the foregoing Accounting was CT Page 1101 mailed on the date hereon to each attorney of record.
BY ___________________________ Jean S. Ferlazzo, Esq.
 SUPPORT GUIDELINES WORKSHEET Income Computation No. of Children 2 Age of Oldest 17 Custodial Non-Custodial 1. Total Gross Income $ $ $2,500.00 2. Deductions a. Federal taxes $ $ 578.58 b. FICA $ $ 102.48 c. N.Y. State taxes $ $ 178.42 d. N.Y. City taxes $ $ 98.15 e. Union Dues $ $ f. Long Term Disability $ $ 3.61 g. Medical insurance $ $ 29.34
Total Deductions — $ — $ 990.58
3. Net Income = $ = $ 1,509.42
Support Computation
4. Special Exemptions a. Day Care Cost (Custodial Only) — $ ______ b. Child Support to the Extent of Actual Payment — $ _______ — $ ________ 5. Disposable Income = $ _______ = $ ________ 6. Combined Disposable Income $1,509.42 7. % Share of Disposable Income _______ % 100 % 8. Child Support Based on Guidelines $ 540.00 9. Each Parent's Share of Line 8 $ _________ $ 540.00
(EXCERPT)
THE HONORABLE EDWARD KARAZIN, JUDGE
MS. FERLAZZO: We do have agreement, CT Page 1102 Your Honor, on the stock.
MR. BALBIRER: On a part of it.
 THE COURT: Okay. What am I tracking? Which —
MR. BALBIRER: I'll tell you what we're doing. We're really — If you look at our Claims for Relief at 4(B) on Page 3, what we are agreeing to do, and I'm going to read into the record what we have agreed to do.
 The jointly owned twenty-three hundred and twenty-one shares —
THE COURT: Let me just find — It's yellow dotted claim?
MR. BALBIRER: Yes.
THE COURT: Okay.
 MR. BALBIRER: 4(B). Page 3, but it doesn't track it exactly. I'm going to use that as a little bit of a basis for my statement.
 The parties jointly own twenty-three hundred and twenty-one shares of New York Times stock. That stock is going to be by both parties transferred into two separate custodial accounts. One is going to be composed on behalf of the oldest daughter composed of sixty percent of that stock. The other will be in a custodial account in the amount of forty percent of that stock.
 That immediately after the custodial accounts are established in the way that I have just set forth, the stock will be sold and the proceeds that remain will be within those respective custodial accounts.
The proceeds and the custodial accounts CT Page 1103 will be jointly managed by the parties. However, since you can only have a custodial account in one name for another, it will be in the name of Mr. Freeman as custodian. But I reiterate, it will be jointly managed. And there will be funds that are received by reason of the sale of the stock.
 That the capital gain income taxes caused by reason of the sale of the stock will come from the respective fund to which it may be attributed.
 We believe with respect to the older child, namely the larger one, the sixty percent one, that we will save tax dollars because of her bracket, she being seventeen years old.
 We are somewhat concerned with respect to the younger child because there may be kiddie tax involved on a capital gain there. One way or the other if we can't get away with it, it will come, whatever the tax is by reason of the sale of that forty percent, will come out of that particular account.
 And I think — And those accounts are for the purpose of applying and using the same funds for the college educational expenses of each of the two daughters.
THE COURT: Is that the limitation?
 MR. BALBIRER: That's the limitation. That's correct. And —
 THE COURT: What happens if one of the daughters doesn't go to college but chooses to go to music school?
 MR. BALBIRER: That's okay. That's certainly the intent, and that's, obviously, a very good question. It would be a post high school educational pursuit, I think CT Page 1104 would be a better way of doing it. Jean, if that's okay with you.
MS. FERLAZZO: That's fine.
 MR. BALBIRER: And I don't think — Of course, if there's going to be any re-deployment of the cash funds after the sale of the stock that the parties have to agree as far as — It's going to be jointly managed to that extent. Neither party should be in complete charge of it. And hopefully, we're not going to have an issue as far as that. We're going to be — This is — managed as conservatively as should be because we don't want to jeopardize it.
 But I think that sums it up, Jean, does it not?
 MS. FERLAZZO: I believe it does, Your Honor.
THE COURT: Okay.
 MS. FERLAZZO: I just would like to have my client's affirmation on it, if you don't mind.
THE COURT: Yes.
 MS. FERLAZZO: Mrs. Freeman, you heard by recitation by Mr. Balbirer of what's to happen to the stock. And you are a one-half owner of that stock, is that correct?
MS. FREEMAN: Yes.
 MS. FERLAZZO: And you have agreed that your share of the stock would go into this fund for the college education of your children?
MRS. FREEMAN: Yes.
MS. FERLAZZO: Under the terms and CT Page 1105 conditions that he has recited here today?
MRS. FREEMAN: Yes.
 MS. FERLAZZO: And is that acceptable to you?
MRS. FREEMAN: Yes.
 MS. FERLAZZO: That was a yes, Your Honor.
 THE COURT: Okay. Would you do the same with your client?
 MR. BALBIRER: I'm fully knowledgeable about some of the comments that Your Honor made a little bit earlier. I'm not at all sure that this is the type of post age eighteen commitment which is necessarily put down and signed in writing.
 THE COURT: Well, that's why I'm looking at the statute.
 MR. BALBIRER: And the reason for that is because we — There is nothing to stop two parents from putting assets in the names of their children prior to age eighteen. And both children are prior to eighteen. We can give these children by our agreement in this divorce assets. And that's what we're doing. And I don't think it's necessary — If Your Honor wants when we get the transcript for — and we'll order that little excerpt of the transcript for this purpose — have both parties simply sign it and acknowledge that it's okay. If Your Honor feels more comfortable with that, we'll do that.
 THE COURT: Well, I just — I would feel more comfortable because I want to play out the "what if." What if somebody says, that's what the Judge did to me. I'm not signing. I'm not giving that money to the CT Page 1106 kids. Then where are we?
MR. BALBIRER: Then what I'll do —
 THE COURT: So, I think — See, the law basically says that if you have post age eighteen support, it has to be in writing signed by the parties. Okay?
 So, I think what we should do here is let's order an expedited copy of the transcript only of that part which is the Agreement. This court finds that to be fair and reasonable and accepts it and makes it an order of the Court subject to getting the excerpt and just have the parties sign off on it. Then it's all done and it's clean and we don't have a problem later on because we never know playing out the "what-ifs." Things happen and people change their minds. And, you know, one of the kids does something to polarize dad or mom and all of a sudden, you know. So —
 MR. BALBIRER: Would it be acceptable to get that excerpt and just have two signature lines that this is our agreement and have both parties sign?
 THE COURT: Yes. I think that sounds good, especially since both of you who are among the premier of divorce lawyers in this area both agree that it's a question as to whether we need to do it or not, but just be a little safe and do it. So, let's just put a couple of signature lines, understood and agreed as above or whatever you want to do. And if we order that quickly — I mean, this decision won't come down before that's done. I'd like to have that physically in my hands, however, before I do my decision. So, we have some lead time. So, when I say expedited, I'm not saying tomorrow, but we it ought to be done within next week or so. Okay?
CT Page 1107
 MS. FERLAZZO: I absolutely concur. I had been persuaded, but I had started thinking about enforcement and I agree. And I think we're better off.
 MR. BALBIRER: Yes. Just better be safe.
 MS. FERLAZZO: Enforcement is an issue that we didn't talk about.
 THE COURT: Okay. And by the way, I don't — It's not a reflection on either one of the parties because I can see that the one thing that you both have in common just from your body language during your wife's testimony concerning the children is that these two kids are the apple of both your eyes. And you've got a lot to be proud of.
* * *
I hereby understand and agree to the above mentioned.
Signed by: Signed by:
_______________________ ________________________ LORNA FREEMAN Date LAWRENCE FREEMAN Date
CERTIFICATE
 I hereby certify that the foregoing excerpt is a true and accurate transcription of the tape recording of the hearing before the Honorable Edward Karazin, Judge, held on December 2, 1992.
Barbara Keiski COURT MONITOR